## 56923. BREMER v. THE STATE.

Webb, Judge.

Dan Bremer was indicted for eight counts of theft by receiving. He was found not guilty on three counts, the jury could not reach a verdict on four counts, but found him guilty on one count with a recommendation for misdemeanor punishment. He was sentenced to a term of eight years, three years to be served in the penitentiary and five on probation, and appeals, enumerating ten errors. We affirm.

In November and December of 1977 and January of

1978 nineteen burglaries were committed in Hall and Forsyth Counties by Richard Parker and Jimmy Carney. In January, after receiving a report that a C. B. scanner had been stolen, Gainesville police officers recalled seeing one fitting its description in an automobile operated by Parker. When apprehended Parker did not have the scanner but stated that he could get it back if he could make a telephone call. Parker, without telling the police whom he was calling, called Bremer telling him that he was in jail because of the scanner and needed it back. They arranged for Bremer to take the scanner to Parker's trailer, where the police later recovered it.

Although Parker and Carney did not have the scanner when arrested, they did have a C. B. base unit in their possession which had been taken along with other items in a Forsyth County burglary. The police asked Parker to call his unknown source to recover the other items, Parker again called Bremer from the jail and he and Bremer set up a dropping place behind a tree near a trash dump. This time Parker told police where the stolen items were to be taken and Bremer was stopped by officer Howard. In his truck were the sought-after items: a shotgun, a clock radio and an AM-FM receiver and speakers. These became State's Exhibits 29 through 31.

Bremer, pastor of the First Baptist Church of Auburn, accompanied officer Howard to the jail and stated that he had purchased the items found in his possession from Parker. Officer Howard explained to Bremer that the items just recovered were stolen and told Bremer that he should bring in any other items he might have purchased from Parker. Bremer assured Howard that he had only dealt with Parker two or three times and had not bought too much, but that he would bring back all that he had purchased.

Later that same night Bremer returned with what he purported to be all his purchases from Parker. This consisted of a fairly full truck load of what might be best described as junk. It included a T.V. and radio that didn't work, a broken gun, lamps, seashell lamps, inexpensive trailer furniture and a child's 18-inch electric organ. The truck was unloaded and officer Howard asked Bremer if he was sure that this was all the merchandise that he had

bought from Parker and Carney. In officer Howard's words, "He said he swore that was all, because he was pastor of the First Baptist Church in Auburn, and he didn't want to get involved in court and anything, and he was sure that this was all he'd bought from them."

Respecting Bremer's vocation and accepting his assurance that what he had just brought in was all he had purchased from Parker, the police let Bremer leave. Parker and Carney were brought to look at what Bremer claimed to be all he had purchased from them and Parker told the officers there was more. When Bremer was called in and told that Parker and Carney had said that there was more, Bremer dropped his head and conceded that there was, explaining that he had given his children some of the items for Christmas. The officers again told Bremer that they wanted everything he had gotten from Parker and Carney. This time Bremer returned with what ended up as being "two rooms of radios, stereo equipment, guns, cameras, clocks, stuff like this." Included in this load was a Scott stero system (State's Exhibit 20), for which Bremer was convicted.

The Scott system was the most valuable of the items received by Bremer that the state produced at trial. Bremer paid $150 for the Scott system and a violin. The owner of both items had paid $100 for the violin and close to $1,500 for the Scott system. A state witness, who dealt in new and used stereo equipment and who sold this particular model, examined the unit and testified that it was a "real good piece of equipment," consisting of speakers worth $329.95 each, an amplifier worth $299, a stereo tuner worth $250, and a turntable worth $250. The unit retailed for $1,775. In the witness' opinion the unit was worth $1,050 to $1,100 as it sat, he could have sold it for $1,100 and would have given $900 for it to allow for a profit on the resale, provided the person trying to sell the unit had proof of ownership. If someone had offered him the unit for $150 he would have thought it to be stolen.

Another burglary victim was called "the camera freak" by Parker because they got movie cameras, pocket cameras and flash cameras, among other things, in the burglary of his home. The total loss was $2,100. According to Parker, everything from the burglary but

a clock radio went to Bremer for less than $150 but the only items recovered from Bremer were State's Exhibits 4, 5, 6, and 7 — a chainsaw, binoculars and two cameras. When asked the whereabouts of the rest of the items Bremer replied, "Your guess is as good as mine," but stated that he had sold "very little" of the merchandise he received.

While committing the nineteen burglaries Parker and Carney would burglarize during the day and contact Bremer, who would meet them, usually by the side of the road at "the Blackshear Place," and purchase the goods. Bremer put the number of meetings at "eight or ten, possibly twelve times." He denied telling officer Howard before the police knew Parker and Carney had committed 19 burglaries that he had dealt with Parker only two or three times. Bremer's home was only a mile from "the Blackshear Place" but he never did business there, meeting them on the road instead.

In his defense Bremer testified that in addition to being pastor of the First Baptist Church at Auburn he dealt in flea market items and for the past six years had followed flea market and garage sales; that he had a warehouse at Whistleville; that he buys and sells at flea markets and dealer auctions; and that he met Richard Parker at a trader's house where Parker represented himself as a trader. Bremer contended that he never knew or had any reason to believe any of the items had been stolen, even when he started to get phone calls from Parker at the jail and he and Parker were arranging for him to leave a scanner at a trailer and a gun and other items behind a tree. He denied being told that the scanner had been stolen when Parker called him from the jail and reiterated that he had no idea, even after the conversation, that the scanner was stolen. When asked why he thought Parker was asking for the scanner from the jail, Bremer replied: "I really didn't have a full knowledge of why. It was my assumption that the detectives were working on a case; and as I have done all of my life, and all of my ministry, I have cooperated with law enforcement, and thinking that they needed this to solve a particular case of some nature or gravity. I did not know what it was about nor was I told by either Mr. Parker or

the authorities anything about it. But on that assumption, and in keeping with my cooperation with law enforcement authorities, as has been the pattern of my life, I did the same thing this time."

Nor did Parker's second phone call from the jail where they agreed for Bremer to leave certain items behind a tree near a trash dump alert him. According to Bremer, the first time it did occur to him that he had received and was retaining stolen goods was when officer Howard told him at the jail that the items he had been caught carrying were stolen and that he should bring in all items purchased from the boys. Asked why did he not bring in the "two rooms of radios, stereo equipment, guns, cameras, clocks, stuff like this," he denied telling the officers that the load of "junk" was all he had. He claimed that he had told the officers that there were more items, specifically the Scott unit.

Peter Miccoli, a preacher and businessman, was Bremer's witness, had accompanied him to the police station, and was with him the entire time. Miccoli testified that Bremer only said that he had other things and was certain that Bremer did not mention any items specifically. Bremer also claimed that he and Miccoli went to his warehouse and discovered that they had "inadvertently" missed some items. He even recalled remarking to Miccoli, "Pete, how come we didn't load these?" Miccoli emphatically stated that this did not occur, then went on to say that the items were intentionally not brought the first time. The good guns, which ultimately showed up in court, were, according to Miccoli, at Bremer's home and had been left out because Bremer had told him they had not been purchased from Parker.

Bremer also sought to explain the prices he gave for the merchandise, claiming that Parker was a skilled trader who had dealt in flea markets, and the prices were pretty close to value. He further explained the low price paid for the Scott unit and other electrical items by saying that brand names mean nothing and he did not even know if they worked, and that when he bought them he assumed in bidding on them that they did not work.

Bremer also called a number of character witnesses.

Among these was A. W. Jackson who was chairman of the Board of Deacons at Bremer's church in Auburn. When asked if Bremer had sent him to the district attorney to try to get the district attorney to do something about the case, Jackson replied: "He mentioned it to us, and we volunteered."

1. As noted by the trial judge, the evidence was more than ample to support the verdict. However, Bremer argues that the evidence was the same as to each count of the indictment and since he was found not guilty on three counts, the verdict of guilty on one count should not stand. This premise overlooks the fact that some of the stolen items were readily identifiable, such as the Scott stereo system, whereas others were of the variety of junk usually found at garage sales.[1] The jury found Bremer not guilty on the cheaper items, was unable to reach a verdict on some of the better items like the shotguns, cameras and clock radios, but had no reasonable doubt of his guilt on the count involving the stereo equipment, which he kept after he had actual knowledge that Parker and Carney had been selling him stolen goods even if its exceptionally low price was not sufficient to rouse his suspicions. Under these circumstances it is beyond the realm of reason to believe that someone of Bremer's intellect did not know or should have known the Scott unit was stolen when he received it and retained it. *Saunders v. State,* 145 Ga. App. 248, 249 (1) (243 SE2d 668) (1978); *Roberts v. State,* 146 Ga. App. 23 (2) (245 SE2d 358) (1978).

2. In his second enumeration Bremer asserts that several exhibits were erroneously admitted since he was not charged with stealing or receiving those items. However, each of the objected to exhibits was stolen by Parker during the period of the indictment and sold to

---

[1] Bremer was found not guilty on Counts 1, 2 and 6. Count 1 involved a small flash camera, six tapes, and tape case and two skate boards; Count 2 involved a plaque with deer horns, and two speakers valued at $35-$40 a pair; Count 6 went to a black and white TV set with a maximum value of $20-$25.

Bremer, and illustrated further dealings between the men during this time period. In theft by receiving cases it has long been held that all transactions between the receiver and seller are relevant to illustrate the receiver's knowledge. *Saunders v. State,* 145 Ga. App. 248, 249, supra, and cits. The complained of exhibits also served to rebut previous statements made by Bremer to officer Howard that he had not purchased much from Parker, and had only dealt with him on two or three occasions. This enumeration cannot be sustained.

3. Bremer insists that the court erred in failing to charge without request Code Ann. § 26-1810 (a) and (b), that it is an affirmative defense to a prosecution for theft by receiving that the defendant was unaware that the property was that of another, or that he acted under an honest claim of right to the property. Contrary to this assertion, the element of knowledge was fully charged. The court charged that there must have been intent to commit the crime, and that in order to convict the state had to prove beyond a reasonable doubt that the defendant must have known or should have known the property was stolen. The court also charged that knowledge was an essential element and that mere possession of stolen goods would not authorize conviction.

Bremer's contention that the trial court should have charged without request the "honest claim of right" provision of Code Ann. § 26-1810 has been decided adversely to him in *Williams v. State,* 142 Ga. App. 764, 769 (11) (236 SE2d 893) (1977). Here, as in *Williams,* "The charge as a whole was full and clear to the effect that the defendant, to be guilty, must *knowingly* purchase *stolen* goods, leaving the issue one of guilty intent. There is a distinction between 'claim of right' and 'lack of intent.' *Breland v. State,* 135 Ga. App. 478, 481 (218 SE2d 153). As we understand his testimony, the defendant did not contend at the trial that the property was not stolen, but only that he was unaware of the fact." Ibid. Indeed, the transcript of the trial proceedings shows that Bremer's primary defense was his Sunday profession and his good character, and that it was fully charged by the court.

4. Objections to the charge on circumstantial evidence are without merit. The instruction given was in

the language of Code § 38-109 and was in fact more favorable to Bremer than what he now contends should have been charged. *Ward v. State,* 238 Ga. 367, 371 (233 SE2d 175) (1977).

5. Bremer objects to the court's charging on admissions, insisting that he made none and that the charge was therefore prejudicial to him. The transcript reveals, however, that the judge did not instruct the jury that there had been an admission or incriminating statement, but defined the terms, cautioned the jury as to the weight to be given them, and left it to them to determine whether any had been made. Even assuming that there had been no admissions or incriminating statements, though we think there clearly were, it was not in error for the court to charge as it did. See *Holcomb v. State,* 130 Ga. App. 154 (3) (202 SE2d 529) (1973); *McWhorter v. State,* 9 Ga. App. 437 (1) (71 SE 589) (1911).

6. After the fact knowledge that goods are stolen and retention of the goods constitutes retaining stolen property and will support a conviction. The evidence abundantly authorized the charge on retaining stolen property and was not erroneous for any reason asserted. *Poole v. State,* 144 Ga. App. 228, 229 (2) (240 SE2d 775) (1977) and cits.; *Saunders v. State,* 145 Ga. App. 248, supra.

7. The jury was adequately instructed that all material allegations must be proven beyond a reasonable doubt. There are no errors as contended. *Ward v. State,* 238 Ga. 367, 370, supra.

8. Failure to give a specific instruction requiring a finding of value beyond a reasonable doubt did not result in any harm to Bremer. The only count appealed involved the Scott stereo system and under the evidence the jury could only find the unit to be worth more than $100, which they did.

9. The final enumeration deals with objections to the court's charging the jury that they could recommend misdemeanor punishment. The judge did so at the joint request of counsel for Bremer and the state, but made it clear that he would not be bound by the recommendation. Self-induced error by requested charge is impermissible. *Davis v. State,* 238 Ga. 239 (232 SE2d 235) (1977); *Hill v.*

*State,* 237 Ga. 523, 524 (3) (228 SE2d 898) (1976).

*Judgment affirmed. Quillian, P. J., and McMurray, J., concur.*

Argued November 7, 1978 — Decided November 28, 1978 — Rehearing denied December 14, 1978 —

*Robert E. Andrews,* for appellant.

*Jeff C. Wayne, District Attorney, Roland H. Stroberg, Assistant District Attorney,* for appellee.